UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

AUDREY P.,                                          :
          Plaintiff,                                :
                                                    :
          v.                                        :          C.A. No. 20-92MSM
                                                    :
ANDREW M. SAUL,                                     :
COMMISSIONER OF SOCIAL SECURITY,                    :
          Defendant.                                :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

At the age of fifty, Plaintiff Audrey P., already suffering from an array of serious impairments,[1] was diagnosed with seronegative rheumatoid arthritis ("RA") and filed her third application for Disability Insurance Benefits ("DIB") under 42 U.S.C. § 40 5(g) of the Social Security Act (the "Act") on August 22, 2017.  Her date-last-insured is December 31, 2019.  A college graduate, Plaintiff had stopped working in 2014 as a school bus driver and office assistant after her fourth spine surgery.  Her application alleges onset of disability as of July 27, 2016, the day following the prior adverse disability decision.

The medical record in connection with the current DIB application was reviewed by four non-examining state agency ("SA") physicians and psychologists who opined that Plaintiff could perform the full range of light work with some postural limits.  After their review, the record was expanded by the addition of three hundred pages of treating records; these reflect that, despite

---

[1] Apart from RA, Plaintiff's diagnosed impairments during the period in issue include diabetes, obesity, depression, anxiety, asthma, neuropathy, cervical disc disease with radiculopathy, persistent anemia, carpal tunnel syndrome, trochanteric bursitis, lumbar spine disease, knee arthritis, foot issues and sinus issues, as well as chronic sinusitis, bronchitis and other infections related to an IgA deficiency.  Plaintiff's medical history reflects twelve surgeries, with one more during the period in issue.  These include four spinal surgeries (resulting in vertebral fusion and the implantation of hardware); surgery on each knee; two surgeries to correct foot deformities; three surgeries to address sinus abnormalities; and surgery to address breast cancer.  She also received frequent injections to address pain in her hips, shoulders and feet.

prescriptions for increasingly aggressive combinations of medications, her RA was not well controlled but was continuing to progress with worsening symptoms, including synovitis, tenderness to palpation ("TTP") and limited range of motion.  Further, according to the records not seen by the SA experts, Plaintiff's functional capacity was repeatedly examined during intensive physical therapy ("PT"), resulting in objective observations of severe limitations in the ability to sit, stand or bend, as well as severe range-of-motion deficits; her anemia (and related fatigue) became so severe as to require a course of IV iron infusion therapy; the persistence of neuropathy resulting in hand tremors, numbness and hand/leg weakness, which remained undiagnosed; tachycardia and restless leg syndrome were newly diagnosed; back pain worsened; and she underwent a third foot surgery.  Yet the Administrative Law Judge ("ALJ") batted aside as non-severe, *inter alia*, Plaintiff's mental health issues and the pattern of serial infections (sinusitis, bronchitis, cystitis and pneumonia) caused by IgA deficiency exacerbated by the increasingly strong immune-suppressant medications she needed to slow the progress of RA, rejected the opinion of Plaintiff's longtime treating rheumatologist, Dr. Edith Garneau, and discounted Plaintiff's testimony regarding her symptoms.  Instead, he adopted a residual functional capacity ("RFC")[2] finding based on the SA experts who had reviewed a materially incomplete record, as well as on his lay assessment of the portion of the medical record the SA experts did not see.  In reliance on the testimony of a vocational expert ("VE") flawed by some troubling discrepancies, he concluded that Plaintiff was not disabled at any relevant time because she could work as a price marker, cashier, school bus monitor or hostess.

---

[2] "RFC" or "residual functional capacity" is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

Plaintiff now contends the ALJ erred in his treatment of the opinion evidence, his rejection of Plaintiff's testimony and his finding that certain impairments were non-severe at Step Two.  Citing <u>Sacilowski v. Saul</u>, 959 F.3d 431 (1st Cir. 2020), she asks the Court to find that the evidence supporting a finding of disability is "overwhelming," to reverse the Commissioner's decision and to remand for entry of an order awarding disability benefits. Defendant Andrew M. Saul has moved for an order affirming the Commissioner's decision.

The matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entirety of this extensive record, I find that the ALJ erred in relying heavily on his lay assessment of the complex post-file-review medical record, as well as in finding persuasive the flawed SA opinions.  I further find that the ALJ's reasons both for rejecting Dr. Gaudreau's opinion as unpersuasive and for discounting Plaintiff's testimony regarding her symptoms are insufficiently supported, as well as that the Step Two determinations are flawed.  However, I also find the medical medley is mixed, preventing this from being a case where the substantial evidence points overwhelmingly in one direction.  Accordingly, I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 11) be GRANTED, with remand for further proceedings, not for an award of benefits, and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 13) be DENIED.

## I.    <u>Background</u>

Based on scoliosis and lumbar disc disease that had begun in childhood, Plaintiff underwent lumbar spinal fusion surgery for the fourth time in October 2014.  In the same month, she stopped work and applied (for the second time) for disability benefits.  The ALJ[3] assigned

---

[3] The second application was determined by a different ALJ from the ALJ whose decision is now under review.

her case acknowledged that she had had repeated back surgeries (involving implantation of extensive hardware), that she exhibited degenerative changes in the hips, feet, knees and neck, with joint and spine tenderness and that her asthma and obesity were severe; however, he also noted the absence of neuropathy, radiculopathy or abnormalities of strength or of gait, as well as the absence of significant symptoms associated with anemia or IgA deficiency.  Based on these findings, this ALJ determined that, for the period up to July 26, 2016, Plaintiff was able to perform light work, further limited to four hours of walking with only occasional stair climbing and other postural and environmental limitations.  Tr. 166-80.  After the Appeals Council declined review, Plaintiff did not appeal further and the second ALJ's determination became final.  Id.

While the prior disability application was pending, on March 16, 2016, Plaintiff's primary care physician, Dr. Thomas Vinod noted "[n]onspecific pain, swelling, and stiffness" and abnormalities of the hands, wrists and elbows, and referred Plaintiff to a rheumatologist.  Tr. 597-600.  Based on this referral, on March 31, 2016, Plaintiff began treating with Dr. Garneau and other rheumatologists on her team.  At the first appointment, Dr. Garneau observed synovitis and tenderness to palpation ("TTP") in the hands, limited range of motion in the neck and spine and pain in the elbows, wrists and knees.  Tr. 447.  During the months of 2016 that followed, Dr. Garneau saw Plaintiff every two months and continued to consider "inflammatory arthritis," but did not reach a definitive diagnosis.  While Dr. Garneau continued to observe pain in the neck, hands, wrists, knees and hips, sometimes with swelling or bogginess, she did not consistently observe swelling, synovitis or decreased range of motion.  Tr. 407-43; e.g., Tr. 443 ("normal movement . . . no synovitis").  For the hip pain, which was persistent and interfered with

walking, Dr. Garneau diagnosed trochanteric bursitis and repeatedly administered injections.  Tr. 435-43.

In July 2016, the prior ALJ's adverse disability decision became final and the current period of disability began.

On January 6, 2017, Dr. Garneau finally made a definitive diagnosis – seronegative rheumatoid arthritis.  Tr. 429-32.  She began treatment with immune-suppressants and noted the complications of medicating Plaintiff to slow the progress of RA because of her persistent anemia and her IgA deficiency.  Tr. 418, 426.  By August 2017, Dr. Garneau observed that RA was progressing despite medication, with "[a]t least 10 swollen and tender joints on today's exam."  Tr. 417.  Dr. Garneau also noted seriously abnormal findings from a cervical MRI, resulting in a diagnosis of radiculopathy, consistent with symptoms of numbness/tingling and decreased sensation in the arm, and referred Plaintiff to the Neurology Foundation.  Id.  During this period, Plaintiff repeatedly suffered from infections, particularly sinusitis; each time, Dr. Garneau had to discontinue RA medications so Plaintiff could take antibiotics.  E.g., Tr. 490, 538, 558, 890.

In August 2017, Plaintiff filed the pending application alleging onset of disability in July 2016.  The new application included RA on the list of alleged impairments.

In November and December 2017, Plaintiff's rheumatology team at Roger Williams Medical Center (covering for Dr. Garneau) noted "persistent stiffness/swelling," despite no active synovitis, TTP or limitations of range of motion seen during the examination; the treating rheumatologist cautioned that Plaintiff's RA was "heading toward tripple [sic] oral" treatment.  Tr. 896-97.  In addition, the test to explore arm tingling, numbness and neck pain yielded abnormal findings establishing neuropathy affecting the arms and wrists.  Tr. 747.  In December

2017, the rheumatologist covering for Dr. Garneau performed an examination resulting in observations of tender points in her shoulder, hips and hands and a shoulder injection was administered; his notes reflect that Plaintiff had recently had to stop RA medication yet again because of "sinusitis requiring antibiotics." Tr. 892-93.  In April 2018, a neurologist following up on the abnormal EMG observed on examination weakness of shoulders, elbows, fingers and hips and an upper extremity tremor; he noted he did not "think that the C-spine MRI findings explain the degree of weakness seen in her hands." Tr. 984-86.

In addition to treating with the rheumatology team (including Dr. Garneau), as well as neurologists at the Neurology Foundation, throughout the period from the date of onset in July 2016 until the end of 2017, Plaintiff continued ongoing treatment with her primary care physician, Dr. Vinod.  Dr. Vinod prescribed medications for and monitored diabetes, asthma, depression, anxiety and Plaintiff's many infections.  Tr. 485-576.  He briefly referred Plaintiff for mental health counseling within his practice, but it was discontinued.  Tr. 496-505. Nevertheless, the Vinod treating record reflects the observations of Dr. Vinod and the counselor that Plaintiff was "easily distracted" and found it "hard to sit still."  Tr. 498, 503, 510.  It also reflects Dr. Vinod's findings of weakness of the hands and the notes of a nurse in the practice that, "[m]obility is very limited due to the ongoing pain and fusion of her entire vertebrae, she is limited in bending standing sitting, making it difficult with ADL's and IADL's."  Tr. 517, 533.

These records were assembled for review by the SA physicians and psychologists. Noting Plaintiff's college education and ability to function within her family and to perform at least some limited activities of daily living, both SA psychologists dismissed her mental health complaints (depression and anxiety) as "mild at best."  Tr. 205.  The non-examining SA physician at the initial phase (Dr. Thomas Bennett) focused on the findings of full range of

motion, absence of active synovitis or TTP and found Plaintiff could perform light work with some postural limitations.  Tr. 192-94.  At the reconsideration phase, the SA physician (Dr. Charles Kahn) focused on the recently submitted April 2018 notes of the neurologist whose examination yielded findings of weakness and swelling of the hands.  Despite this development, Dr. Kahn nevertheless endorsed the same limitations as those developed by Dr. Bennett, including no limitations in the ability to use the hands for manipulation.  Tr. 206-07.

After the SA file reviews at the initial and reconsideration phases were concluded, Plaintiff's RA continued to progress despite repeated adjustments of medication, including repeated stoppage due to the frequent recurrence of infections.  For example, in June 2018, Dr. Garneau noted "worsening fatigue," a return of hip pain despite an injection and tenderness (but no synovitis) of the shoulders and hips, Tr. 1254-58, while the neurologist observed "[b]ilateral hand weakness with sensory symptoms."  Tr. 1202.  Also in June 2018, Dr. Garneau referred Plaintiff to PT, which she attended twice a week from June until August 2018.  Tr. 1108-42.

At the first PT appointment, an examination was conducted.  It resulted in the findings that Plaintiff's lumbar range of motion was "extremely limited" and her hip range of motion was "significantly limited"; she had point tenderness and TTP, with "severe AROM deficits in all planes of motion related to spinal fusion, impaired neurodynamic's [sic] and gluteal/core weakness."  Tr. 1109.  For her objective assessment, the therapist noted "[f]unctional difficulty include[s] standing, sitting, bending over and walking all 2/2 pain," id., and set goals of the ability to tolerate standing and sitting for thirty minutes and bending over without difficulty, Tr. 1110.  After fourteen sessions over a three-month period, none of these goals had been achieved; PT treatment was terminated in August 2018.  Tr. 1181.  Copies of the PT reports were provided to Dr. Garneau, who saw Plaintiff in August 2018, and was aware of the lack of progress.  E.g.,

1180-87.  Far from improvement, at the August appointment, Dr. Garneau observed exacerbated RA symptoms, including synovitis and limited range of motion in the hands and wrists, with TTP in the hands, wrists and shoulders; she noted, "has persistent synovitis today with 8 swollen and tender joint count."  Tr. 1253.  To address the progress of the disease, Dr. Garneau increased one medication and added another.  Tr. 1254.

At the end of 2017, Plaintiff changed her primary care physician.  During 2018, she saw Dr. Seerat Aujla who continued to prescribe and monitor medications for diabetes, asthma and depression/anxiety; Dr. Aujla also newly diagnosed tachycardia and restless leg syndrome, adding these to Plaintiff's list of impairments.  Tr. 1268, 1284.  Dr. Aujla's notes reflect that RA is "not currently well controlled," and, at various appointments, she observed tremor in the upper extremities, restricted range of motion, pain on movement of the shoulders and upper extremities and worsening back pain.  Tr. 1279, 1305, 1310.  In September 2018, noting Plaintiff's worsening restless leg problems, Dr. Aujla sent Plaintiff for review of her anemia.  Tr. 1272.  Dr. Bharti Rathmore found Plaintiff to be "symptomatic with depleted iron stores," including fatigue and dizziness; he prescribed intravenous infusions of iron.  Tr. 1324.  In November 2018, Plaintiff's podiatrist observed the exacerbation of "painful" deformities of the left foot, found that "conservative treatment options had failed" and performed foot surgery on November 2, 2018.  Tr. 1345.

For a three-month period in 2018, Plaintiff returned to treating with a mental health counselor for depression and anxiety.[4]  See Tr. 87-99.  These sessions ended with the counselor's observation that, "she is stable and doing well enough that she doesn't need counseling anymore.

---

[4] The counselor's treating record was not produced until the case reached the appeals council.  However, Plaintiff testified (accurately as the later-produced treating notes revealed) about this course of treatment during the hearing so the ALJ was aware of it.  Tr. 128.

Her anxiety doesn't seem to interfere with the daily activities and depression is minimal." Tr. 93. At the hearing, Plaintiff consistently explained that the therapist ended treatment because, "I was handling my anxiety well, and . . . I have all the tools that I need to work through things." Tr. 128.

Signed in September 2018,[5] Dr. Garneau provided her opinion regarding Plaintiff's functional capacity. The opinion focuses on the diagnoses of RA and IgA deficiency, noting that the latter is significant because it impacts adversely the RA treatment Plaintiff can tolerate due to the risk of infection. Tr. 1019. For clinical findings, consistent with her contemporaneous treating notes, Dr. Garneau listed synovitis, tenderness to palpation and elevated inflammatory markers. Id. For functional limitations, Dr. Garneau found that Plaintiff could rarely lift a two-gallon container of milk, could sit for up to two hours, could stand for up to one hour and could walk for up to thirty minutes. Tr. 1020-21. For additional limitations, Dr. Garneau opined that Plaintiff would need to lie down occasionally during the workday and would be frequently off-task because of "pain, fatigue, [and] the effects of medication," which would interfere with her ability to concentrate, persist or keep pace. Tr. 1021.

At the hearing before the ALJ, Plaintiff testified that pain is her biggest obstacle to working; her back, hips and neck hurt all the time. Tr. 121-24. The regularly repeated injections in the hips and shoulders helped only temporarily. Tr. 125. Anemia has caused fatigue and recently required iron infusions because it became extreme; these periodic intravenous treatments take up to two hours each. Tr. 136. Because of the four spinal fusion surgeries, she

---

[5] Dr. Garneau signed this opinion one month after receiving the final reports from the PT provider, which contained objective findings of serious limitations affecting range of motion, bending, sitting, standing and walking and which reflect no meaningful progress towards goals set for improvement despite Plaintiff's consistent attendance at appointments. Tr. 1180. Also, one month before her opinion was signed, Dr. Garneau recorded objective observations of synovitis, TTP and limited range of motion affecting the hands, wrists and shoulders, resulting in another increase in prescribed medications. Tr. 1253-54.

has limited mobility, including limited ability to sit.  Tr. 124.  As to RA, Plaintiff testified that

she has good days and bad days; on a good day, she can walk for fifteen minutes, can manage

stairs with difficulty, can lift up to seven pounds and can sit and stand for up to twenty to thirty

minutes.  Tr. 125-26, 140.  Because of the RA symptoms affecting her hands, she writes and eats

with difficulty and is unable to do crafts, sewing or anything involving fine manipulation.  Tr.

121-22.  She explained that her diabetes treatment upsets her stomach and requires frequent trips

to the bathroom over the course of a day.  Tr. 160.

      For the ALJ's hypothetical to the VE, the ALJ relied on the findings of the SA

physicians and psychologists, except that he added a manipulative limitation (permitting only

frequent, not constant, handling), an environmental limitation and no production or pace work.

In response, the VE testified that Plaintiff's prior work was ruled out, but that other jobs

remained possible, including price marker, cashier, school bus monitor and host/hostess.  Tr.

155.

## II.   <u>Standard of Review</u>

      The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do

more than merely create a suspicion of the existence of a fact and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Ortiz v.

Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); <u>Rodriguez v.

Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981); <u>Brown v. Apfel</u>, 71 F.

Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by

substantial evidence, the Commissioner must be affirmed, even if the Court would have reached

a contrary result as finder of fact.  <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819

F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991);

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).  The

determination of substantiality is based upon an evaluation of the record as a whole.  Brown, 71

F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st

Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider

evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in

reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30.  The Court does

not reinterpret the evidence or otherwise substitute its own judgment for that of the

Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148,

153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not

the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).

      If the Court finds either that the Commissioner's decision is not supported by substantial

evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim,

the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42

U.S.C. § 405(g).  Allen v. Colvin, No. CA 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3,

2015) (citing Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir.1996)).  If the Court finds that

a judicial award of benefits would be proper because the proof is overwhelming and there is no

contrary evidence to directly rebut it, the Court can remand for an award of benefits.  Sacilowski,

959 F.3d at 439, 441; Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001).

## III.  <u>Disability Determination</u>

      The law defines disability as the inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment, which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. § 416(i); 20 C.F.R. § 404.1505.  The impairment must be severe,

making the claimant unable to do previous work, or any other substantial gainful activity which

exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.       The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §

404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not

disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or

combination of impairments that significantly limit physical or mental ability to do basic work

activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. §

404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's

impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. §

404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past

work) prevent doing other work that exists in the local or national economy, a finding of disabled

is warranted.  20 C.F.R. § 404.1520(g).  Significantly, the claimant bears the burden of proof at

Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart,

267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI

claims).

The claimant must prove the existence of a disability on or before the last day of insured

status for the purposes of disability benefits.  Deblois v. Sec'y of Health & Human Servs., 686

F.2d 76, 79 (1st Cir. 1982); 42 U.S.C. §§ 416(i)(3), 423(a), 423(c).

### B.       Step Two Determination

An impairment is "not severe" at Step Two if the medical evidence establishes no more than a slight abnormality that would have only a minimal effect on an individual's ability to work.  SSR 85-28 at *2, 1985 WL 56856 (Jan. 1, 1985).  As the First Circuit has long held, Step Two is a screening device used to eliminate applicants "whose impairments are so minimal that, as a matter of common sense, they are clearly not disabled from gainful employment." McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1122 (1st Cir. 1986); Burge v. Colvin, C.A. No. 15-279S, 2016 WL 8138980, at *7 (D.R.I. Dec. 7, 2016), adopted sub nom., Burge v. Berryhill, C.A. No. 15-279 S, 2017 WL 435753 (D.R.I. Feb. 1, 2017).  Further, if there is error at Step Two, but the sequential analysis continues because of another severe impairment, the error is generally deemed harmless.  White v. Colvin, No. CA 14-171 S, 2015 WL 5012614, at *8 (D.R.I. Aug. 21, 2015); see Syms v. Astrue, Civil No. 10-cv-499-JD, 2011 WL 4017870, at *1 (D.N.H. Sept. 8, 2011) ("[A]n error at Step Two will result in reversible error only if the ALJ concluded the decision at Step Two, finding no severe impairment.") (collecting cases).  Thus, as long as the ALJ's RFC analysis is performed in reliance on the opinions of state agency reviewing experts or treating sources who considered the functional impact of the impairment in question, there is no material error in failing to include it as a severe impairment at Step Two. Evans v. Astrue, No. CA 11–146S, 2012 WL 4482366, at *4-6 (D.R.I. Aug. 23, 2012) (no error in ignoring diagnosis of antisocial personality disorder at Step Two where ALJ relied on medical expert's testimony regarding resulting limitations).

C.    **Opinion Evidence**

For applications like this one, filed after March 27, 2017, the SSA has fundamentally changed how adjudicators assess opinion evidence.  The familiar and longstanding requirements – that adjudicators must assign "controlling weight" to a well-supported treating source's

medical opinion that is consistent with other evidence, and, if controlling weight is not given, must state the specific weight that is assigned – are gone. 20 C.F.R. § 404.1520c(a). Instead, adjudicators "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." Id. Rather, an ALJ must consider the persuasiveness of all medical opinions in a claimant's case record. See 20 C.F.R. § 404.1520c. The most important factors to be considered when the Commissioner evaluates persuasiveness are supportability and consistency; these are usually the only factors the ALJ is required to articulate. 20 C.F.R. § 404.1520c(b)(2); Jones v. Berryhill, 392 F. Supp. 3d 381, 839 (M.D. Tenn. 2019); Gorham v. Saul, Case No. 18-cv-853-SM, 2019 WL 3562689, at *5 (D.N.H. Aug. 6, 2019).

**D.    Evaluation of Subjective Symptoms**

When an ALJ decides to discount a claimant's subjective statements about the intensity, persistence and severity of symptoms, he must articulate specific and adequate reasons for doing so or the record must be obvious. See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309-10 (D. Mass. 1998). A reviewing court will not disturb a clearly articulated finding supported by substantial evidence. See Frustaglia, 829 F.2d at 195. If proof of disability is based on subjective evidence so that the credibility determination is determinative, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)). Guidance in evaluating the claimant's statements regarding the intensity, persistence, and limiting effects of subjective symptoms is provided by SSR 16-3p, 2017 WL 4790249, at *49462 (Oct. 25, 2017). It directs the ALJ to consider the entire case

record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; any other relevant evidence; and whether statements about the intensity, persistence, and limiting effects of symptoms are consistent with the medical signs and laboratory findings.  SSR 16-3p, 2017 WL 4790249, at *49465.  When there is no evidence to directly rebut the claimant's testimony, nor any reason to question its credibility, it should be taken as true.  Sacilowski, 959 F.3d at 441.

> **E.     Pain**

"Pain can constitute a significant non-exertional impairment."  Nguyen v. Chater, 172 F.3d 31, 36 (1st Cir. 1991).  Congress has determined that a claimant will not be considered disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  SSR 16-3p, 2017 WL 4790249, at *49462; 20 C.F.R. § 404.1529(c)(3).  In determining whether the medical signs and laboratory findings show medical impairments that reasonably could be expected to produce the pain alleged, the ALJ must consider the nature, location, onset, duration, frequency, radiation, and intensity of any pain; precipitating and aggravating factors (e.g., movement, activity, environmental conditions); type, dosage, effectiveness, and adverse side-effects of any pain medication; treatment, other than medication, for relief of pain; functional restrictions; and the claimant's daily activities.  Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986); SSR 16-3p, 2017 WL 4790249, at *49465; Gullon v. Astrue, No. 11-

cv-099ML, 2011 WL 6748498, at *5-6 (D.R.I. Nov. 30, 2011).  An individual's statement as to

pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).  However, the

individual's statements about the intensity, persistence, and limited effects of symptoms may not

be disregarded "solely because the objective medical evidence does not substantiate the degree

of impairment-related symptoms."  SSR 16-3p, 2017 WL 4790249, at *49465.

   If a treating physician finds that a patient's physical impairment is real, the physician

may rely on the claimant's subjective statements regarding the impact of pain on the ability to

function in opining to the  patient's RFC and the ALJ may not discount an otherwise well-

founded opinion on that basis.  Ormon v. Astrue, 497 F. App'x 81, 85-86 (1st Cir. 2012).  "[T]he

statements of the claimant and his doctor must be additive to clinical or laboratory findings" in

considering pain's functional implications.  Avery, 797 F.2d at 21.  It is error for the ALJ to

place "an extreme insistence on objective medical findings to corroborate subjective testimony of

limitations of function because of pain."  Id. at 22.

## IV.   Analysis

### A.   Opinion Evidence and Plaintiff's Subjective Statements

   Rheumatoid arthritis – RA – is a "progressive disease" that, if unchecked by treatment,

can cause painful, permanent and potentially deforming changes to joints, organs and systems.

Cruz v. Astrue, C.A. No. 11-638M, 2013 WL 795063, at *1 (D.R.I. Feb. 12, 2013), adopted,

2013 WL 802986 (D.R.I. Mar. 4, 2013).  Because it is a disease that "can wax and wane," a

disability claim based on RA presents the Commissioner with a medically complex inquiry that

requires analysis by qualified medical professionals.  Id. at *14.  Further, the RA claimant's

subjective testimony regarding pain and its impact on her ability to function is pivotal in such

cases; such testimony should not be discounted except in reliance on substantial evidence or

16

well-grounded adverse credibility findings.  Id. at *17-18.  In this case, Plaintiff challenges as error the ALJ's reliance on the SA physicians, whose opinions the ALJ used (together with his lay assessment of the post-SA treating record) not just as the foundation for the RFC, but also to support both the finding that the treating rheumatologist's opinion is unpersuasive and the rejection of Plaintiff's testimony regarding the functional limitations caused by pain.  I find these arguments to be well founded.

At the initial phase, the non-examining SA physician, Dr. Bennett, focused on the reality that, at most appointments during the period he reviewed (2016 and 2017), Dr. Garneau observed swelling and tenderness, but not strength deficiencies, abnormal gait, synovitis, TTP or limited range of motion.  Tr. 207.  At the reconsideration phase, the SA physician (Dr. Kahn) saw a few additional records from early 2018, but rejected as immaterial the neurologist's findings of neuropathy, a tremor, weakness and swelling in the hands and wrists and concluded that the EMG result would not support any additional limitations; he endorsed the findings made by Dr. Bennett at the initial phase, which had been limited to 2016 and 2017 records.  The ALJ found the Bennett/Kahn SA opinions to be persuasive because they "are supported by and consistent with the record as a whole," except that the ALJ acknowledged that the "[a]dditional medical evidence . . . justifies . . . some manipulative and environmental limitations," as well as a limitation on crouching.  Tr. 27.

The SA physicians did not see most of the treating record from 2018.  These 2018 records reflect the worsening of Plaintiff's RA symptoms as observed by Dr. Garneau, the observations of functional limitations by the PT therapists, the need for yet another foot surgery, the exacerbation of anemia requiring intravenous infusion and the new diagnoses of tachycardia and restless leg syndrome.  By way of example, Dr. Bennett's opinion emphasizes "no active

synovitis, nor TTP; full ROM," Tr. 194, and includes the finding that Plaintiff can "occasionally" bend at the waist, Tr. 193; Dr. Kahn simply endorses these conclusions, noting only that the April 2018 abnormal EMG is not serious enough to add any additional limitations.[6]  After these opinions were signed, the record swelled, *inter alia*, to include the objective findings on examinations performed over three months by PT specialists reflecting severe functional limitations and the inability to bend, while Dr. Garneau's treating notes reflect that she continued to increase Plaintiff's RA medications, yet synovitis, TTP and limited range of motion recurred.

The ALJ's heavy reliance on these SA physician opinions transgresses the well-settled proposition that SA opinions are not "substantial evidence" when "the state-agency physicians were not privy to parts of [plaintiff's] medical record [which] detract from the weight that can be afforded their opinions."  Andrea T. v. Saul, C.A. No. 19-505WES, 2020 WL 2115898, at *5 (D.R.I. May 4, 2020), adopted, C.A. No. 19-505WES (D.R.I. June 5, 2020) (listing cases) (alterations in original); Virgen C. v. Berryhill, C.A. No. 16-480 WES, 2018 WL 4693954, at *3 (D.R.I. Sept. 30, 2018).  In this case, the evidence reflecting worsening that the SA physicians did not see is substantial and material.  Having rejected the opinion of Dr. Garneau (who was aware of this evidence of Plaintiff's worsening and incorporated it into the physical capacity questionnaire she completed), the ALJ was left to rely on his lay assessment of this complex medical record.  This is error that requires remand.

The bookend to this error is the ALJ's rejection of Dr. Garneau's opinion as of "little persuasive value."  Tr. 27.  As his reasons supporting this finding, the ALJ's decision focuses first on Dr. Garneau's opinion that "emotional factors" do not contribute to Plaintiff's functional

---

[6] Even the ALJ disagreed with this finding.  His lay assessment of the record resulted in his conclusion that Dr. Kahn was wrong because "the claimant's impairments would result in some manipulative . . . limitations."  Tr. 27. The ALJ added the limitation of "frequent bilateral handling" to his RFC (developed without guidance from a medical professional) to reflect this conclusion.  Tr. 20.

limitations and Dr. Garneau's treating notes, which consistently found Plaintiff to be "alert, awake and fully oriented"; the ALJ concludes that these clash with Dr. Garneau's opinion that "pain, fatigue, [and] the effects of medication [would] interfere with concentration, persistence, or pace such that [she] would be 'off task'" frequently.  Tr. 27, 1021.  This "reason" makes no sense.  Just because Plaintiff's depression and anxiety are mild, it does not logically follow that "pain, fatigue [and] the effects of medication" would not distract her to the point where she would be frequently off task.

Second, the ALJ's decision focuses on Dr. Garneau's findings of severe limits in the ability to lift, stand, walk and of the need to lay down frequently; he concludes that these limits are inconsistent with the medical record (including Dr. Garneau's own notes) in that Plaintiff had "overall preserved strength" and had been able to perform at least some activities of daily living. Tr. 27.  The problem with this second reason is that it is largely based on the pre-SA review period as reflected in the SA opinions.  For the period after the SA file review, the record is loaded with evidence of weakness and severely limited functionality.  Indeed, just in the month preceding the signing of her opinion, Dr. Garneau received the PT Discharge Evaluation reflecting "minimal changes in overall functional capacity . . . continues to be limited functionally and experience high pain levels," Tr. 1152, and recorded her own observations of exacerbation of RA symptoms.  Thus, the Garneau opinion is entirely consistent with and well-supported by these contemporaneous records.  Otherwise, consistent with RA, the evidence reflects that Plaintiff had good days and bad days.  Tr. 140.  Whether the good days collectively amount to a material inconsistency with Dr. Garneau's opinion requires a medical assessment of complex clinical findings, which the ALJ lacked the ken to perform.  Bottom line – the ALJ's

determination to afford Dr. Garneau's opinion little persuasive weight is tainted by error requiring remand for further consideration.

The third error caused by the ALJ's reliance on the SA opinions is the ALJ's finding that Plaintiff's testimony was inconsistent with the medical record, causing him to discount her descriptions of pain and its impact on her.[7] Tr. 21-26.  In assessing Plaintiff's credibility, the ALJ's decision plays up any mention of slight "improvement" in the record and overlooks the overall conclusions by various treating providers.  The most dramatic example of this cherry picking is the ALJ's description of the clinical assessments by the PT therapists who consistently found severe functional limitations caused by pain, and, rarely, noted slight improvements.  Yet the ALJ marshals their records as evidence that is inconsistent with Plaintiff's testimony.  In so doing, he ignored the PT providers' overarching conclusion that Plaintiff suffered from significant and unresolved "[f]unctional difficulty includ[ing] standing, sitting, bending over and walking all 2/2 pain."  Tr. 1109; see Tr. 1152 (clinical assessment at discharge: "[p]atient presents with minimal changes in overall functional capacity measured since IE and continues to be limited functionally and experience high pain levels").  Similarly, the ALJ focused on the rheumatologists' occasion findings of improvement with medication changes, Tr. 22, but ignored the overarching rheumatological finding that the RA was progressing despite such medication increases.  Nor did he consider that Plaintiff's subjective statements should not be lightly rejected when they had been evaluated and accepted by the treating sources (such as Dr. Garneau) who relied on them to prescribe increasingly aggressive medications.  Renaud v. Colvin, 111 F. Supp. 3d 155, 164 (D.R.I. 2015) (inappropriate to reject subjective reports in

---

[7] The ALJ did not find Plaintiff to be a malingerer, nor could he in the face of this record.  Tr. 192 (finding Plaintiff's statements substantiated by objective medical evidence); Tr. 1020 (Dr. Garneau opines that Plaintiff is not a malingerer.).

treatment notes, unless there is indication that doctor disbelieved patient); Cruz, 2013 WL 795063, at *18 (illogical for RA claimant to exaggerate symptoms resulting in prescriptions for increasingly toxic medley of medication).

At bottom, whether this medical record amounts to "evidence to directly rebut [Plaintiff's] testimony" or presents a "reason to question [her] credibility," Sacilowski, 959 F.3d at 441, must depend on how the record, particularly the post-SA review record, is assessed by a qualified medical professional.  I find that the ALJ's credibility finding is tainted by error requiring remand.

### B.      Step Two Findings

Plaintiff argues that the ALJ's Step Two findings are tainted by error.  She bifurcates the argument, focusing first on the finding that Plaintiff's mental impairments are non-severe impairments, and second on the finding that IgA deficiency, asthma, diabetes and the foot deformities are all non-severe.

The ALJ's conclusion that Plaintiff's mental health impairments are non-severe is troublesome.  In this case, the established mental impairments were depression and anxiety, which the SA psychologists found – correctly – to have only a mild impact on concentration; consistently the post-SA review record reflects the note of the counselor that, "[h]er anxiety doesn't seem to interfere with her daily activities and depression is minimal."  Tr. 93.  The problem is that agency policy requires that reviewing SA psychologists also must consider the impact of the claimant's physical condition on her mental capacity, including her ability to concentrate.  SSR 96-8p, 1996 WL 374184, at *6 (July 2, 1996).  However, the SA psychologists simply do not mention pain, fatigue, the effect of medication or any other physical condition as a factor they considered in assessing Plaintiff's ability to concentrate.  Instead, they drew solely

from Plaintiff's minimal mental health treatment for depression and anxiety, as well as the Function Report (which reflects the limited ability to drive, shop, prepare food and perform light housework).  Based on these sources, they forged their finding that Plaintiff's ability to concentrate is only mildly impacted.  Tr. 205.  The SA psychologists appear to have ignored all of Plaintiff's physical stressors.  The ALJ's Step Two mental health finding is grounded on this flawed determination.

This error is material.  Plaintiff would have been awarded benefits if the ALJ had accepted Dr. Garneau's finding of seriously impaired concentration due to "pain, fatigue [and] the effects of medications," and not because of "emotional factors."  Tr. 1020-21.  The ALJ rejected this finding in reliance on the SA psychologists who ignored "pain, fatigue [and] the effects of medication" and on the SA physicians, who <u>did</u> focus on "pain, fatigue [and] the effects of medication," but who completed a form that did not ask them to opine regarding the impact of pain (or anything else) on concentration.  In effect, the ALJ based his Step Two mental health findings regarding mental impairments on the absence of medical analysis (other than Dr. Garneau's opinion) of how Plaintiff's ability to concentrate was impacted by pain, fatigue and the effects of medication.  <u>See</u> <u>Sacilowski</u>, 959 F.3d at 439-40 (where treating physician opined to absences and SA physicians were not asked to consider absences, "no contrary evidence" has been provided).  Because the ALJ's erroneous treatment of the Garneau opinion seems at least partially rooted in this Step Two failure of the SA psychologists to consider the severity of the impact of Plaintiff's pain, fatigue and many medications on her mental capacity, including her ability to concentrate, persist or maintain pace, I recommend remand for further consideration of this issue.

Plaintiff's secondary challenge to the ALJ's Step Two findings – that IgA deficiency, asthma, diabetes and the foot deformity are non-severe – is also concerning.  For example, the IgA deficiency caused repeated[8] infections (sinusitis, bronchitis, pneumonia) and limited Plaintiff's ability to benefit from RA medication; diabetes required medication that caused repeated stomach upset, requiring frequent interruptions to use the bathroom; and Plaintiff's foot deformity caused intermittent pain (although no observed impact on gait) and resulted in injections and ultimately surgery (for the third time) to address two bunions.  Plaintiff's asthma was characterized as "moderate, persistent" and had been found to be severe by the ALJ during the prior proceeding; there is no evidence that this chronic condition had materially improved.

The Court recognizes that it is well settled that, if these findings are error, such error would be harmless because the sequential analysis continued, and the symptoms of these impairments were considered in formulating the RFC.  See White, 2015 WL 5012614, at *8 (D.R.I. Aug. 21, 2015) (discussing "well-settled principle that a claimant cannot demonstrate harmful error at Step Two unless the failure to make severity findings ends the analysis"). However, with such a complex and interconnected medical picture, the ALJ's Step Two approach – viewing each of these as an isolated condition that, so viewed, is *de minimis* in effect – is problematic.  By way of just one example, the ALJ undercounted the number of IgA-related infections and noted an improvement from stopping work (because of no further contact with children); he completely ignored the increasing frequency of these infections over the course of the relevant period, how repeated infections treated with a course of antibiotics alone would

---

[8] The ALJ counted six such infections from October 2016 to October 2018.  Tr. 14.  The Commissioner concedes that this count omitted at least two infections.  In the more recent period, the Court's count suggests that Plaintiff appeared to have eight such infections in just an eleven-month period (from May 2018 to April 2019).  Whatever is the right number, this level of periodic infection requiring a course of antibiotics is not just very serious in itself, but also impacted Plaintiff's RA because of the need to stop RA medication to take antibiotics.

impact the ability to consistently attend work, as well as the significant adverse impact of these infections on Dr. Garneau's ability to manage the progression of RA.  Finding this to be error, I recommend that, on remand, the ALJ should reassess his Step Two findings regarding these impairments and their impact on Plaintiff's overall functionality, with assistance from a qualified medical professional.

Mindful of this recommendation that remand is required, I close by flagging a final problem with the ALJ's analysis that was not mentioned by Plaintiff.  See Heidi M. v. Berryhill, No. CV 17-412PAS, 2018 WL 6788034, at *1 (D.R.I. Dec. 26, 2018) (when justice requires, issues in Social Security cases may be raised *sua sponte* by court).  Based on the VE's testimony and his own RFC, the ALJ found that Plaintiff could work as a price marker, cashier, school bus monitor and host/hostess.  At least two of these findings make little sense.  For example, with the limitation of only "frequent bilateral handling," as the ALJ found, Tr. 20, it is difficult to understand how such an individual could work as a "price marker" when handling is the primary function required for the job.  Dictionary of Occupational Titles ("DOT"), Clerical and Sales Occupations, 209.587-034 (Marker), http://www.govtusa.com/dot/dot02a.html.  Also troubling is that the VE did not seem to understand the duties of a school bus monitor.  As Plaintiff herself had to point out to the VE during her testimony at the hearing, in Rhode Island, the job involves constant going up and down stairs at each stop of the bus, Tr. 154, which the PT records make clear is a function that is "slow and painful" for Plaintiff.  Tr. 1152.  In light of these concerns, on remand, I recommend that a new VE opinion be procured.[9]

---

[9] While I have not considered bending by a school bus monitor for purposes of the above recommendation, I note my own observation that, in Rhode Island, for several years, school bus monitors also are required to bend deeply and look under the bus at every stop; that this is a requirement for the job was confirmed by a recent (though now expired) job posting, which states that a school bus monitor must have the ability to bend.  Westerly Public Schools 2020 Job Posting, https://widget.schoolspring.com/job.cfm?jid=3382822.  With an RFC limited to occasional bending only, as the ALJ found, Tr. 20, or no bending as the PT records reflect, Tr. 1152, it is difficult to square the VE's testimony with what may be the current reality of the requirements for this position.

C.        **Remand for Further Proceedings or Award of Benefits**

Plaintiff argues that the evidence of disability is overwhelming and further proceedings are not necessary.  Therefore, she contends, the Court should simply award benefits.  While Plaintiff's impairments appear to be very serious, indeed, potentially disabling, I disagree that this is a case for an award of benefits.

The Court's determination whether to remand for further proceedings or to award benefits is a matter of discretion informed by whether the proof of disability is very strong and there is no contrary evidence.  Maricelys S. v. Saul, C.A. No. 18-479WES, 2019 WL 2950129, at *7 (D.R.I. July 9, 2019), adopted, C.A. No. 18-479WES (D.R.I. Nov. 7, 2019).  Courts generally exercise the power to award benefits when it is "clear" from the record that the claimant is entitled to benefits.  Sacilowski, 959 F.3d at 437.  This is based on the reality that remand for further proceedings is unnecessary when the evidence of disability is "overwhelming" and there is no contrary evidence to rebut it.  Id. at 439-41.

There is no doubt that the record here is replete with substantial evidence on which a finding of disability could be based.  The problem is that there is also evidence pointing the other way that the Court lacks the legal authority or medical acumen to weigh and consider.  For example, at some appointments, consistent with RA as a disease that waxes and wanes, Cruz, 2013 WL 795063, at *14, Dr. Garneau and other rheumatologists found mostly full strength, full range of motion and little swelling or TTP.  E.g., Tr. 439, 896.  The record includes references to activities that seem inconsistent with the finding of persistent lack of functionality.  E.g., Tr. 1129 ("she went swimming which felt pretty good"); Tr. 1133 ("she went hiking yesterday").  Some providers found Plaintiff's strength to be largely intact.  E.g., Tr. 408, 421, 524, 748.  Virtually all recorded her gait as normal.  E.g., Tr. 408.  And while the SA physicians produced

their opinions based on a materially incomplete record, for purposes of the determination whether to remand for further proceedings or for an award of benefits, the Court should consider that four SA experts reviewed a significant portion of this file and reached findings supporting the conclusion that Plaintiff is capable of work.  Based on the mixed nature of this evidence, my recommendation is that the Court should exercise its discretion to remand for further proceedings rather than for an award of benefits.

**V.      Conclusion**

Based on the foregoing analysis, I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 11) be GRANTED, with remand for further proceedings, not for an award of benefits, and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 13) be DENIED.  Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 8, 2021